Roy A. Katriel (265463)
**THE KATRIEL LAW FIRM, PLLC**
4225 Executive Square,  Suite 600
La Jolla, CA 92037
Tel:   (858) 242-5642
Fax:   (858) 430-3719
Email: rak@katriellaw.com

Ralph B. Kalfayan, (SBN 133464)
**KRAUSE, KALFAYAN, BENINK &
SLAVENS, LLP**
550 West C Street, Suite 530
San Diego, California 92101
Telephone:  619-232-0331
Facsimile:  619-232-4019
Email: ralph@kkbs-law.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| PAUL R. RIVA AND DANIELLE ARDAGNA, On Behalf Of Themselves And All Others Similarly Situated,<br><br>                              Plaintiffs,<br><br>                    v.<br><br>PEPSICO, INC.,<br>                              Defendant. | **CASE NO.:  3:14-CV-2020-EMC**<br><br>FIRST AMENDED CLASS ACTION COMPLAINT<br><br>DEMAND FOR JURY TRIAL<br><br>Judge: Hon. Edward M. Chen<br>Courtroom: 5, 17th Floor |

### **NATURE OF THE ACTION**

1.      Plaintiffs Paul R. Riva and Danielle Ardagna (collectively "Plaintiffs") by and through their attorneys, bring this class action against Pepsico, Inc. ("Defendant" or "Pepsi"), on behalf of themselves and on behalf of all others who, during the Class Period alleged herein, ingested Pepsi One or Diet Pepsi drinks within the State of California.  On multiple occasions during the Class Period, Plaintiff Riva purchased Pepsi One and Plaintiff Ardagna purchased Diet Pepsi drinks within California.  Under Section 25249.6 of California's Safe Drinking Water and Toxic Enforcement Act of 1986 (commonly referred to as "Proposition 65"), "[n]o person in the course of doing business shall knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity without first giving clear and reasonable warning to such individual."  Unbeknownst to Plaintiffs, however, despite this statutory prohibition, during the Class Period, Defendants' Pepsi One and Diet Pepsi drinks contained 4-methylimidazole ("4-MeI"), a carcinogen found on the list of Proposition 65's known carcinogens, in sufficient quantities so as to require disclosure by Defendant, and warranting medical monitoring of individuals who ingested these drinks at or above certain threshold levels so as to account for the increased risk of cancer—and specifically one forms of cancer known as bronchioloalveolar cancer (also referred to as in situ pulmonary adenocarcinoma) — brought about by the ingestion of these 4-MeI containing beverages.  This action asserts tort claims for negligence and strict liability, and seeks, *inter alia*, medical monitoring as relief.  Pursuant to Federal Rule of Civil Procedure 23(c)(4), which provides that, "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues," (Fed. R. Civ. P. 23(c)(4)), Plaintiffs bring this action to litigate on a classwide basis the following  issues as to Pepsico's liability, or any subset of them that the Court deems appropriate for certification under Rule 23(c)(4):

- Whether Pepsi One and Diet Pepsi products sold in California during the Class Period contained 4-MeI;

- Whether the levels of 4-MeI contained in Pepsi One and Diet Pepsi drinks sold in California during the Class Period were sufficiently high so as to present an increased risk of cancer for persons who ingested these drinks at or above certain threshold levels;

- Whether Pepsico failed to label or otherwise failed to warn purchasers of Pepsi One and Diet Pepsi drinks that the beverages contained 4-MeI and of the risks associated with it;

- Whether Pepsico owed a duty of care to purchasers of PepsiOne and Diet Pepsi drinks within California during the Class Period and, if so, the nature of that duty of care;

- Whether Pepsico's actions in marketing and offering for sale Pepsi One and Diet Pepsi drinks within California during the Class Period breached any legal duty of care that Pepsico was required to adhere to;

- Whether any increased risk of contracting cancer from the ingestion above certain levels of Pepsi One and Diet Pepsi drinks sold in California during the Class Period warrants medical monitoring of those persons who ingested these drinks at or above such levels in order to monitor and guard against the onset of cancer in the future;

- The reasonable medical monitoring that is medically and legally justified and appropriate for persons who ingested Pepsi One and Diet Pepsi drinks sold within California during the Class Period;

2.     Plaintiffs do not seek in this action to obtain class certification for the entire action, nor do they seek certification of the damages portion of the case. Instead, pursuant Federal Rule of Civil Procedure 23(c)(4), Plaintiffs seek only classwide certification and litigation of the foregoing issues.  Once resolution of those issues is litigated on a classwide basis, individual class members seeking to obtain

compensation from a medical monitoring fund from Pepsico would need to individually litigate their damages, which would entail proof that they, in fact, ingested the Pepsi One or Diet Pepsi drinks during the Class Period at or above the threshold quantities, and have sought or will seek medical monitoring as a result.

## PARTIES

3.  Plaintiff Paul R. Riva is a resident of San Diego, California.  During the Class Period, Mr. Riva purchased and consumed bottled or canned Pepsi One in San Diego County on multiple occasions.  On average, Mr. Riva drank Pepsi One 2 to 3 times each and every week, oftentimes drinking even more.  None of the cans or bottles of Pepsi One purchased by Mr. Riva contained any labeling or other disclosure that the drinks contained 4-MeI or a carcinogen known to the State of California.  Had Mr. Riva been made aware of this fact, he would have either not purchased the drink, or would not have paid as much as he did for the Pepsi One drinks, as he would have factored in the attendant health risks that accompanied those purchases.

4.  Plaintiff Danielle Ardagna is a resident of San Diego County in California. During the Class Period, Ms. Ardagna purchased and consumed Diet Pepsi in San Diego County on multiple occasions.  On average, Ms. Ardgana consumed 3 to 4 cans of Diet Pepsi per day, or nearly 30 cans of Diet Pepsi per week.  None of the cans or bottles of Diet Pepsi One purchased by Ms. Ardagna contained any labeling or other disclosure that the drinks contained 4-MeI or a carcinogen known to the State of California.

5.  Defendant Pepsico Inc. is a corporation organized under the laws of the State of North Carolina and having its principal place of business at 700 Anderson Hill Road in Purchase, New York 10577.

## JURISDICTION AND VENUE

6.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act, because the matter in controversy exceeds the

sum or value of $5,000,000 exclusive of interest and costs, at least one member of the class of plaintiffs is a citizen of a State different from Defendant.

7. The Court has personal jurisdiction over Defendant pursuant to Cal. Code Civ. P. § 410.10, as a result of Defendant's substantial, continuous and systematic contacts with the State, and because Defendant has purposely availed itself of the benefits and privileges of conducting business activities within the State.

8. Venue is proper in this Southern District of California pursuant to 28 U.S.C. § 1391(b) and (c), because Defendant resides (i.e., is subject to personal jurisdiction) in this district, and a substantial part of the events or omissions giving rise to the claims, including the offering for sale and purchase of the Pepsi One and Diet Pepsi drinks by Plaintiffs and the putative class members, occurred in this judicial district.


**THE CARCINOGENICITY OF 4-MeI FOUND IN DEFENDANT'S DRINKS**

9. MeI is an impurity generated during the manufacture of caramel colors III and IV used in some soft drinks.

**The National Toxicology Program Report**

10. 4-MeI's toxic and carcinogenic effects have been subject of recent study by various scientific bodies and scientists.  The National Toxicology Program, for example, is an interagency program within the United States Public Health Service of the United States Department of Health and Human Services, and is headquartered at the National Institute of Environmental Health Sciences of the National Institutes of Health.   Established in 1978, the National Toxicology Program is charged with coordinating toxicological testing activities, strengthening the science base in toxicology, developing and validating improved testing methods, and providing information about potentially toxic substances to health regulatory and research agencies, scientific and field communities, and the public.

11.     MeI has been found by the National Toxicology Program ("NTP") to cause lung tumors in laboratory animals.  For example, the NTP *Technical Report on the Toxicology and Carcinogenesis Studies of 4-Methylimidazole in F344/N Rats and B6C3F Mice,*" was a nearly 300-page published scientific report released by the NTP in January 2007, in which it reported findings on 2-year controlled studies of exposure of laboratory animals to 4-MeI.  The NTP Technical Report concluded that:

> Under the conditions of  these 2-year feed studies, . . .[t]here was **clear evidence of carcinogenic activity** of **4-methylimidazole** in male and female B6C3F mice based on increased incidences of alveolar/bronchial neoplasms.

NTP Technical Report [available at http://ntp.niehs.nih.gov/results/pubs/longterm/reports/longterm/tr500580/listedreports/tr535/index.html], at p. 8 (italics in original, boldface added).

12.     As detailed in the NTP Technical Report, the term "clear evidence of carcinogenic activity" is one that:

> is demonstrated by studies that are interpreted as showing a dose-related (i) increase in malignant neoplasms, (ii) increase of a combination of malignant and benign neoplasms, or (iii) marked increase of benign neoplasms if there is an indication from this or other studies of the ability of such tumors to progress to malignancy.

*Id*. at 10.

13.     The NTP Report also explained the reasoning behind selecting 4-MeI as the chemical to be studied for carcinogenic activity and toxicity:

> The National Cancer Institute nominated 2- and 4-methylimidazole for study.  The nomination was based on the chemical's widespread use in electronic and pharmaceutical industries, *potential for human exposure as contaminants in food products* and in the environment, neurotoxicity in various animal species, the lack of chronic toxicity data,  and a suspicion of carcinogenicity from a structure-activity standpoint.

*Id*. at 17 (emphasis added).

**The Consumer Reports Food Safety & Sustainability Center Position**

14.     The NTP was not the only scientific organization to study or opine on the carcinogenic or toxic risk posed by 4-MeI.

15.     According to Urvashi Rangan, a toxicologist and Executive Director of the Consumer Reports Food Safety & Sustainability Center, for example, "[t]here is no 'safe' level of 4 MeI, but if you have to set a threshold, it should be well below the Prop 65 level (29 micrograms/day) and more like 3 micrograms/day." Rangan calls exposure to 4 MeI "an unnecessary risk."

16.     According to testing performed by Consumer reports, in December 2013, Pepsi sold in California contained an average 29.1 micrograms of 4 MeI per can.

17.     According to testing performed by Consumer reports, from April to September 2013, Diet Pepsi sold in California contained an average 30.5 micrograms of 4 MeI per can.

18.     According to testing performed by Consumer reports, from April to September 2013, Pepsi One sold in California contained an average 43.5 micrograms of 4-MeI per can, and during December 2013, Pepsi One sold in California contained an average of 39.5 micrograms of 4 MeI per can.  These levels represent approximately **10 times** the levels of 4-MeI above which the Executive Director for the Consumer Reports Food Safety & Sustainability Center considers "an unnecessary risk."

19.     The Consumer Report's testing of the beverages yielded results for 4-MeI levels that are actually on the low side of that found by other researchers.  For example, a 2010 published study found as much as 613 µg/L in colas.  The authors estimates that "consumer exposure to the maximum 4-MeI given by soft drinks was . . . 5.7 µg/kg of boy weight/day, in . . . the United States."  So, a 60-kg (132 lbs) person **would be consuming 342 µg/day** (ignoring other sources of the chemical).  Cunha SC, Barrado, AI, Faria MA, et. al., *"Assessment of 4-(5-) methylimidazole in soft*

*drinks and dark beer.*" Journal of Food Composition and Analysis; 2010. doi: 10.1016/j.jfca.2010.08.009 (quoted in Center for Science In the Public Interest, "*Petition To Bar Use of Caramel Colorings Produced With Ammonia and Containing the Carcinogens 2-Methylimidazole and4-Methylimidazole*" (submitted to U.S. Food and Drug Administration Feb. 6, 2011)), at 4, n.14.

20.     Yet another study of cola beverages, conducted by researchers at the University of California at Davis, found that the levels of 4-MeI in cola beverages to range between .30 to .36 micrograms per milliliter, which amounts to a range between 108 to 130 µg per 12 ounce serving can. *See* Moon J-K, Shibamoto T., "Formation of carcinogenic 4(5)-methylimidazole in Maillard reaction systems. " Journal of Agric. Food Chem. 2011; 59:615-8 (cited in Center for Science In the Public Interest, "*Petition To Bar Use of Caramel Colorings Produced With Ammonia and Containing the Carcinogens 2-Methylimidazole and4-Methylimidazole*" (submitted to U.S. Food and Drug Administration Feb. 6, 2011)), at 3, n.13. This corresponds to approximately **30 times** the levels of 4-MeI above which the Executive Director for the Consumer Reports Food Safety & Sustainability Center considers "an unnecessary risk."

**The Center For Scient In The Public Interest Petition To Bar 4-MeI-Containing Caramel Coloring**

21.     Since 1971, the Center for Science in the Public Interest ("CSPI") has been a strong advocate for nutrition and health, food safety, alcohol policy, and sound science.  Over the years, CSPI has grown along with its reputation as an influential and independent science-based organization. When he was Commissioner of the Food and Drug Administration, David Kessler credited CSPI with "one of the greatest public health advances of the century" by promoting the importance of the link between diet and health to the government, industry, and the public.  In 2007, the FDA Commissioner awarded CSPI the agency's highest honor, the Harvey W. Wiley Special Citation.

22. On February 16, 2011, the CSPI filed a "*Petition To Bar Use of Caramel Colorings Produced With Ammonia and Containing the Carcinogens 2-Methylimidazole and4-Methylimidazole*" with the United States Food and Drug Administration. The Petition reviewed and analyzed the available and published scientific studies of 4-MeI, including the NTP Report, and urged the FDA to ban its use in foods and drinks in the United States. After extensively reviewing and describing the scientific findings respecting 4-Methylimidazole, the Center for Science in the Public Interest, detailed that, **"[t]hese imidazole-containing colorings may be causing hundreds or thousands of cancers in the American population."** Center for Science In the Public Interest, "*Petition To Bar Use of Caramel Colorings Produced With Ammonia and Containing the Carcinogens 2-Methylimidazole and4-Methylimidazole*" (submitted to U.S. Food and Drug Administration Feb. 6, 2011), at 6 (emphasis added). An online version of the CSPI Petition is available at http://www.cspinet.org/new/201102161.html (last visited October 17, 2014).

## THE PROPRIETY OF MEDICAL MONITORING

23. As alleged herein, the NTP Report found "***clear evidence of carcinogenic activity* of 4-methylimidazole** in male and female B6C3F mice based on increased incidences of alveolar/bronchial neoplasms." Alveolar/bronchial neoplasms are forms of lung cancer that are now commonly referred by the term in situ pulmonary adenocarcinoma. It is a term describing certain variants of lung cancer arising in the distal bronchioles or alveoli that exhibit a specific non-invasive growth pattern. Bronchioloalveloar carcinoma is a type of non-small cell lung cancer, and is defined as a small (i.e., less than or equal to 3 cm) solitary tumor with pure alveolar epithelial appearance, lacking any invasion of the interstitium.

24. Lung cancer is the most commonly occurring noncutaneous cancer in

men and women combined in the United States and is the leading cause of cancer deaths. In 2014 alone, it is estimated that there will be 224,210 new cases diagnosed, and 72,330 women and 86,930 men will die from this disease.

25.    Recent studies have shown that a viable and effective protocol for medical monitoring can be fashioned and administered for the early detection of lung cancer and thereby improve survival rates.

26.    Low-dose helical computed tomography (LDCT) and molecular techniques has been the most recent screening medical monitoring and screening protocol for the early detection of lung cancer.  LDCT was shown to be more sensitive than chest radiography. In the Early Lung Cancer Action Project (ELCAP), whose results were reported in the renowned medical journal *Lancet*,  LDCT detected almost six times as many stage I lung cancers as chest radiography, and most of these tumors were no larger than 1 cm in diameter. The ability of LDCT to reduce lung cancer mortality was demonstrated in the randomized, controlled National Lung Screening Trial (NLST): a statistically significant relative reduction of 20% in lung cancer mortality was observed, as was a statistically significant 6.7% relative reduction in all-cause mortality.

27.  Moreover, for bronchioloalveolar carcinomas particularly, early detection is key.  This is because peer-reviewed published medical studies have shown that, if completely resected, the prognosis of surgically treated pulmonary adenocarcinoma (formerly known as bronchioloalveolar carcinoma) **is 100%.**  *See* Van Schil, P. E.; Asamura, H; Rusch, V. W.; Mitsudomi, T; Tsuboi, M; Brambilla, E; Travis, W. D. (2012). "Surgical implications of the new IASLC/ATS/ERS adenocarcinoma classification". *European Respiratory Journal* 39 (2): 478–86.  This, of course, depends upon early detection through screening or monitoring.

### PEPSICO'S UNLAWFUL NONDISCLOSURE OF THE CARCINOGEN

28.    Pepsico has had and continues to have exclusive knowledge of material facts concerning the amount of 4-MeI in Pepsi One and Diet Pepsi drinks that were

sold in California.  As the outfit that manufactured the drink, Pepsi was aware both of the presence and quantity of 4-Mei in the subject drinks, yet intentionally chose to not disclose these facts to unsuspecting consumers like Plaintiffs and the putative class members.

29.     As the manufacturer of the Diet Pepsi and Pepsi One drinks sold in California, Pepsico had a duty of reasonable care in manufacturing these drinks to ensure that they did not pose an unreasonable risk of future bodily injury to those who ingested the drinks.  Pepsico, however, breached its duty of reasonable care by including 4-MeI in the quantities that it did in Pepsi One and Diet Pepsi drinks, and failing to properly disclose as much.  The proximate result of that breach is that persons who ingested these drinks on a regular basis, like Plaintiffs Riva and Ardagna, find themselves at an increased risk of contracting bronchioloalveolar cancer and therefore justifiedly require or will require medical monitoring or screening.

30.     As the manufacturer of the Pepsi One and Diet Pepsi drinks sold to California consumers, Pepsico is also strictly liable for any risk of harm caused by these products.   The Diet Pepsi and Pepsi One products sold in California were defectively designed in that they unnecessarily contained 4-MeI in quantities that exposed persons ingesting the drinks to an unreasonable and undisclosed risk of contracting cancer.

31.     As the manufacturer of the Pepsi One and Diet Pepsi drinks, Pepsico is also strictly liable for its failure to warn of the increased risk of contracting cancer through the exposure to 4-MeI contained in these drinks, given that this risk was either know or knowable at the time that Pepsico sold its drinks to California consumers.

## CLASS ACTION ALLEGATIONS

32.     Pursuant to Federal Rule of Civil Procedure 23(b)(3) or 23(b)(2), and specifically Rule 23(c)(4), Plaintiffs seek to represent a class of all persons who purchased in California during the four years preceding the filing of the original

Complaint ("the Class Period") in this action, Diet Pepsi, or Pepsi One primarily for personal, family, or household use, and not for resale.

33.    The members in the proposed class and subclass are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all class members in a single action will provide substantial benefits to the parties and Court.

34.    Federal Rule of Civil Procedure 23(c)(4) provides that, "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues," (Fed. R. Civ. P. 23(c)(4)).   Resorting to that Rule, Plaintiffs bring this action to litigate on a classwide basis the following  issues as to Pepsico's liability, or any subset of them that the Court deems appropriate for certification under Rule 23(c)(4):

    a)  Whether Pepsi One and Diet Pepsi products sold in California during the Class Period contained 4-MeI;

    b)  Whether the levels of 4-MeI contained in PepsiOne and Diet Pepsi drinks sold in California during the Class Period were sufficiently high so as to present an increased risk of cancer for persons who ingested these drinks at or above certain threshold levels;

    c)  Whether Pepsico failed to label or otherwise failed to warn purchasers of Pepsi One and Diet Pepsi drinks that the beverages contained 4-MeI and of the risks associated with it;

    d)  Whether Pepsico owed a duty of care to purchasers of Pepsi One and Diet  Pepsi drinks within California during the Class Period and, if so, the nature of that duty of care;

    e)  Whether Pepsico's actions in marketing and offering for sale PepsiOne and Diet Pepsi drinks within California during the Class Period breached any legal duty of care that Pepsico was required to adhere to;

f) Whether any increased risk of contracting cancer from the ingestion above certain levels of Pepsi One and Diet Pepsi drinks sold in California during the class period warrants medical monitoring of those persons who ingested these drinks at or above such levels in order to monitor and guard against the onset of cancer in the future;

g) The reasonable medical monitoring protocol that is medically and legally justified and appropriate for persons who ingested Pepsi One and Diet Pepsi drinks sold within California during the Class Period;

Plaintiff reserves the right to amend these enumerated issues on which classwide treatment is sought based on any discovery or case developments prior to moving for class certification.

35.    As the foregoing paragraph indicated, there are questions of law and fact common to Plaintiffs and the class exist and predominate over any such questions affecting only individual class members.  *See* paragraphs 34(a) – 34(g).  Common questions raised by the issues detailed at paragraphs 34(a)-(g) predominate over questions affecting only individual class members, such that these issues may and should be litigated on a classwide basis.

36.    Plaintiffs' claims are typical of class members' claims in that they are based on the same underlying facts, events, and circumstances relating to Pepsi's conduct; namely, the increased risk of contracting bronchioloalveolar cancer alleged to be brought about by the regular ingestion of Pepsi One or Diet Pepsi drinks containing 4-MeI, and that did not include disclosure of this chemical or the risks associated with its repeated ingestion.   Both plaintiffs are California residents who regularly purchased and ingested these drinks and therefore have a vested interested aligned with the Class members' interest to zealously litigate Pepsico's liability in connection with exposing Class members to 4-MeI.

37.     Plaintiffs will fairly and adequately represent and protect the interests of the classes, have no interests incompatible with the interests of the classes, and have retained counsel competent and experienced in class litigation.

38.     The class is sufficiently large for purposes of class litigation because it contains at least hundreds of thousands of members who purchased Pepsi One or Diet Pepsi beverages in California during the past 4 years

39.     Class treatment is superior to other options for resolution of the controversy because the relief sought for each class member is relatively small such that, absent representative litigation, it would be unfeasible for class members to redress the wrongs done to them.  Moreover, absent classwide adjudication, there would be a risk of multiple lawsuits against Defendant that could impose inconsistent and incompatible standards of conduct on Pepsi regarding, *inter alia*, its labeling, disclosure, and medical monitoring obligations.

40.     Pepsi has acted or refused to act on grounds generally applicable to the class, thereby making final injunctive relief and corresponding declaratory relief appropriate.  Specifically, Pepsi's non-disclosure with respect to the presence of 4 MeI or of a carcinogen known to the State of California has been uniform with respect to all Pepsi One and Diet Pepsi drink containers sold within the State of California during the Class Period.  If Plaintiffs prevail on the merits of their claim, therefore, then final injunctive relief mandating that Pepsi provide this disclosure to all class members and to the consuming public at large would be proper.

## COUNT I

**(NEGLIGENCE—MEDICAL MONITORING COSTS SOUGHT AS RELIEF)**

41.     Plaintiffs incorporate by reference the allegations of this Class Action Complaint with the same force and effect as if those allegations had been fully restated here.

42.     Pepsico owed Plaintiffs, the putative class members, and the consuming public, a duty of reasonable care when manufacturing, promoting, offering for sale, and selling its Pepsi One and Diet Pepsi products.  Such a duty of reasonable care required Pepsico either to manufacture these beverages without any carcinogens known to the medical and scientific community that significantly increased the risk of having those who ingest Pepsico's drinks contract cancer, or, barring that, to conspicuously disclose the presence and extent of such a carcinogen in these drinks and its health risks.

43.     Pepsico breached its legal duty by manufacturing its Pepsi One and Diet Pepsi drinks with the 4-MeI content that it did, and/or by failing to disclose that the Pepsi One and Diet Pepsi beverages sold within the State of California contained 4-MeI, a carcinogen, present in these drinks.

44.     4-MeI is a toxic chemical and a carcinogen.  Well before the Class Period, Pepsico knew or reasonably should have known of the significantly increased risk posed to those who regularly drink Pepsi One and Diet Pepsi products as a result of the 4-MeI.  As published in the NTP Report:

> There was *clear evidence of carcinogenic activity of 4-methylimidazole* in male and female B6C3F1 mice based on increased incidences of alveolar/bronchiolar neoplasms.

NTP Technical Report, at p.8.

45.     The particular types of cancer, i.e., bronchioloalveolar neoplasms (also referred to as pulmonary adenocarcinoma), documented by the NTP long-term study of 4-MeI exposure are of particular seriousness, yet are ones for which early evaluation, detection, and diagnosis are of significant clinical significance.

46.     Plaintiffs and putative class members have been injured by Pepsico's breach of its legal duty and its selling of Pepsi One and Diet Pepsi drinks containing 4-MeI in the quantities that this drinks had.  To safeguard their health and mitigate any damages for future medical treatment, it would be reasonable for Plaintiffs and

individual members of the putative class to seek medical monitoring.  Such monitoring, however, is expensive and, because its need arises as a result of Defendant's legal wrongdoing, its cost should be borne by Pepsico.

47.     Once Pepsico's liability is established on a classwide basis by way of a resolution in favor of the Class of the Rule 23(c)(4) issues, therefore, Pepsico should be ordered to erect a medical monitoring common fund from which individual class members may claim damages through individual litigation of their damages, payments or refunds for medical monitoring costs actually incurred or reasonably foreseen to be incurred.

## COUNT II

### (STRICT LIABILITY – DEFECTIVE DESIGN)

48.     Plaintiffs incorporate by reference the allegations of this First Amended Class Action Complaint with the same force and effect as if those allegations had been fully restated here.

49.     As the manufacturer of the Pepsi One and Diet Pepsi drinks sold to the class members, Pepsico is strictly liable for any harm caused to the class members as a result of the defective design of these drink products.

50.     The Pepsi One and Diet Pepsi drinks sold in California during the Class Period were defectively designed in that, per their design, they included unacceptable amounts of 4-MeI, a known carcinogen, that increased the risk to those who ingested the drinks of contracting bronchioloalveolar cancer.  There were available alternative designs available for the drinks that would not have entailed the use of 4-MeI either at all or in the quantities that were employed by Pepsico in designing and manufacturing these beverages, yet Pepsico refused to implement these alternative designs.

51.     As a proximate and foreseeable result of Pepsico's defective design of

the Pepsi One and Diet Pepsi beverages, Plaintiffs and members of the putative class have sustained harm and injury in that they face an increased risk of contracting bronchioloalveolar cancer.

52.   As a result of this increased risk of contracting bronchioalveolar cancer, Plaintiffs and members of the putative class are justified in seeking medical monitoring, particularly as such monitoring and early detection of bronchioloalveolar cancer has been shown in the medical literature to significantly affect the persons' prognosis.

53.   Once Pepsico's liability is established on a classwide basis by way of a resolution in favor of the Class of the Rule 23(c)(4) issues, therefore, Pepsico should be ordered to erect a medical monitoring common fund from which individual class members may claim damages through individual litigation of their damages, payments or refunds for medical monitoring costs actually incurred or reasonably foreseen to be incurred.

## COUNT III

### (STRICT LIABILITY  -- FAILURE TO WARN)

54.   Plaintiffs incorporate by reference the allegations of this First Amended Class Action Complaint with the same force and effect as if those allegations had been fully restated here.

55.   As the manufacturer of the Pepsi One and Diet Pepsi drinks sold to the class members, Pepsico is strictly liable for its failure to warn of any particular risks known or knowable at the time of the products' manufacture and sale.   At the time that Pepsico sold Pepsi One and Diet Pepsi drinks to Plaintiff and the members of the putative class during the Class Period, several published and peer reviewed studies , including the NTP Technical Report, had already recognized and reported the increased particular risk of carcinogenic activity caused by 4-MeI.

56.   Pepsico never disclosed, much less warned, Plaintiffs, members of the

putative class, or the public that the 4-MeI found in its Pepsi One or Diet Pepsi products posed a particular risk of significantly increasing the risk to persons who regularly ingested these drinks to contract bronchioloalveolar cancer.

57.   As a proximate and foreseeable result of Pepsico's failure to warn of the risks of 4-MeI as part of its manufacture of the Pepsi One and Diet Pepsi beverages, Plaintiffs and members of the putative class have sustained harm and injury in that they face an increased risk of contracting bronchioloalveolar cancer.

58.   As a result of this increased risk of contracting bronchioloalveolar cancer, Plaintiffs and members of the putative class are justified in seeking medical monitoring, particularly as such monitoring and early detection of bronchioloalveolar cancer has been shown in the medical literature to significantly affect the persons' prognosis.

59.   Once Pepsico's liability is established on a classwide basis by way of a resolution in favor of the Class of the Rule 23(c)(4) issues, therefore, Pepsico should be ordered to erect a medical monitoring common fund from which individual class members may claim damages through individual litigation of their damages, payments or refunds for medical monitoring costs actually incurred or reasonably foreseen to be incurred.

# **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of the other members of the Class, request award and relief as follows:

A.    An order certifying that this action is properly brought and may be maintained as a class action for the issues identified pursuant to Federal Rule of Civil Procedure 23(c)(4), that Plaintiffs be appointed Class Representatives and Plaintiffs' counsel be appointed Class Counsel.

B.    That Pepsico be ordered to pay the costs of disseminating notice to absent class members of the pendency of this class action and their rights with respect to the same;

C.    An Order requiring Pepsico to set up, fund from which those individual class members can seek monetary recovery for the costs of actual or anticipated medical monitoring expenses incurred by them as a result of Pepsico's conduct alleged herein;

D.    An order awarding Plaintiff her costs of suit, reasonable attorneys' fees, and pre and post-judgment interest.

E.    Such other and further relief as may be deemed necessary or appropriate.

Dated:  October 17, 2014

_____/s/ Roy A. Katriel_____
Roy A. Katriel (265463)
**THE KATRIEL LAW FIRM,** 4225
Executive Square,  Suite 600
La Jolla, CA 92037
Tel:   (858) 242-5642
Fax:   (858) 430-3719
e-mail: rak@katriellaw.com

Ralph B. Kalfayan, (SBN 133464)
**KRAUSE, KALFAYAN, BENINK &
SLAVENS, LLP**
550 West C Street, Suite 530
San Diego, California 92101
Telephone:  619-232-0331
Facsimile:  619-232-4019
e-mail: ralph@kkbs-law.com

*Counsel for Plaintiffs*